UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

CORDELL MILLER

Defendant

CRIMINAL No. 23-cr-10309-WGY

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The United States respectfully submits this Sentencing Memorandum in the above-captioned case, currently scheduled for sentencing on June 9, 2025. The government believes that their recommendation of 51 months of incarceration is an appropriate sentence in this matter. Following the completion of this sentence, the government also requests that the defendant be on supervised release for a period of 36 months. In addition, the defendant is required to pay the mandatory special assessment of $200 in this case.

## I. Procedural History

On November 3, 2023, the defendant, Cordell Miller, (hereafter "the defendant" or "MILLER") was arrested and ordered detained in federal custody for the instant offense. ECF Nos. 2, 7,8,9, & 14. On Monday, February 10, 2025, the defendant pled guilty to Counts One and Four of the Indictment charging him with Trafficking in Firearms and Conspiracy to do so, in violation of 18 U.S.C. § 933(a)(1) and (a)(3); and Distribution of and Possession with Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C)). ECF No. 54. There is B Plea agreement between the government and MILLER.

The defendant admits that he committed the crimes specified in these counts and is in fact guilty of each one.

MILLER faces the following maximum penalties on Count One of the Indictment, Trafficking in Firearms, a sentence of up to 15 years of imprisonment, three years of supervised release, fine of up to $250,000; and a mandatory special assessment of $100; and on Count Four of the Indictment, Distribution of and Possession with Intent to Distribute Cocaine, a sentence of up to 20 years of imprisonment, three years of supervised release, fine of up to $1,000,000; and a mandatory special assessment of $100. *See* Presentence Investigation Report ("PSR") cover sheet and ¶¶ 83, 86, 87, 88, 92, & 93.

## II. Factual Background

Background of Investigation

Over the summer and fall of 2023, ATF Special Agents learned from a confidential source that MILLER was allegedly a significant source for trafficking firearms and ammunition in and outside of the City of Boston. The ATF purchased firearms from MILLER in Massachusetts and New Hampshire using a confidential human source. The ATF then successfully introduced a cooperating witness or "CW" into the operation to conduct a series of controlled purchases of firearms and narcotics utilizing MILLER. MILLER ultimately middled deals of firearms and narcotics between the CW and his two co-defendants Malcom Desir ("DESIR") and Alan Robinson ("ROBINSON").

August 2023 Controlled Purchase (MILLER/DESIR)

On August 9, 2023, MILLER agreed to directly connect with the CW and provide him with cocaine. ATF correspondingly conducted a controlled purchase with the CW physically and electronically surveilled by law enforcement during a purchase of the cocaine. The CW

contacted MILLER via a recorded phone line to learn the location of the controlled purchase, which was Brewer Avenue in Brockton, Massachusetts.

Shortly after MILLER met the CW at the location in Brockton, DESIR arrived, and MILLER introduced him to the CW. Desir was carrying a black plastic shopping bag containing cocaine. MILLER introduced Desir to the CW as an acquaintance who supplies narcotics, specifically cocaine, whenever MILLER needs it.

While DESIR and MILLER were in the CW's car, from the black bag, DESIR weighed and parceled out 3 ounces of pressed cocaine for the CW in exchange for $2,700.00 in U.S. currency. DESIR provided the CW with his phone number, and informed the CW that he would supply the CW with drugs when he needed them. The substance was later tested by the DEA Lab, yielding a positive result for cocaine, and weighed approximately 95 grams, including packaging.

During a subsequent controlled purchase without MILLER, which occurred in September of 2023 between DESIR and the CW, DESIR sold 57 grams of cocaine to the CW, including packaging, and a Ruger P95DC 9mm with laser beam attachment, serial number 314-66843, in exchange for $2,700.00 in U.S. currency. This sale also included two extended magazines, two regular-size magazines, and 31 live rounds of various 9mm ammunition. During this purchase, DESIR informed the CW that ironically that the Ruger P95DC 9mm, which DESIR had just sold the CW, was originally purchased by DESIR two years prior from MILLER.

<u>October 2023 Controlled Purchase (MILLER/ROBINSON)</u>

In August, and September, the CW initiated contact with MILLER attempting to purchase a firearm. In October the CW contacted MILLER again to arrange the purchase of a firearm. MILLER and the CW exchanged messages in which it was clear that MILLER would

introduce the CW to the sellers of the firearms the CW was looking to purchase, that the CW would negotiate the firearms and price with the seller, and that the seller would ultimately give MILLER an amount the seller thought appropriate for facilitating the exchange. MILLER then sent the CW several text messages with screenshots depicting several firearms that were purportedly being offered for sale by this third party.

On October 23, 2023, the CW made a purchase of four firearms: two handguns and two rifles for $2,800 from ROBINSON and MILLER, inside ROBINSON's apartment in Littleton, Massachusetts. Specifically, ROBINSON and MILLER sold the CW, a Stag arms AR15, with no serial number, a HIPOINT 9mm rifle, bearing serial number F239643, a Polymer 80 pistol, with no serial number, and a Ruger .38 caliber pistol, bearing serial number 565 20813.



During that audio video recorded firearm sale, the CW related to ROBINSON, MILLER, and the other individual present that he was a convicted felon and could not lawfully obtain these firearms on their own. According to MILLER, in this exchange, the CW did not make it known that he was a felon and legally unable to obtain firearms until after MILLER introduced the CW to the seller, and the seller and CW began discussing the firearms and terms. According to this audio video recorded firearm sale, MILLER is observed greeting the CW outside the residence, bringing him into the residence and introducing him to the seller. After the CW and seller begin

discussing the firearms and terms, the CW states '…I'm a felon, I can't go buy these…'. [1] MILLER and ROBINSON were not licensed federal firearms dealers, nor did they possess any type of license permitting them to legally own or carry a firearm in Massachusetts.

According to ATF agents who possess specialized knowledge and training as to the identification, origin, and classification of firearms and ammunition, the firearms sold by ROBINSON and MILLER to the CW, which were not privately made, as well as all the ammunition was manufactured outside the Commonwealth of Massachusetts.

## III. Legal Framework

The United States Sentencing Guidelines ("Guidelines") are "the starting point and the initial benchmark" in sentencing. Gall v. United States, 552 U.S. 38, 49-50 (2007). Following the Supreme Court's decision in Gall v. United States, "District Court judges can choose sentences that differ from the Sentencing Commission's recommendations—provided of course that they stay within the range set by the statutes of conviction and consider the sentencing factors arrayed in § 3553(a)." *See e.g.*, Gall, 552 U.S. at 41, 49–50 & n. 6. While Gall made the Guidelines advisory, "[t]his is not a blank check for arbitrary sentencing." *Id.* "Judges *still* must start out by calculating the proper Guidelines range—a step so critical that a calculation error will usually require resentencing." *Id.* "The reason for this is simple. Congress wants judges to do their best to sentence similar defendants similarly." *See* Booker, 543 U.S. at 250–54, 259–60. "And starting with the Guidelines' framework—which gives judges an idea of the sentences imposed

[1] The CW has an extensive criminal history including convictions for robbery and drug distribution and is working in part for consideration in a federal drug distribution case.

on equivalent offenders elsewhere—helps promote uniformity and fairness." *See* Gall, 552 U.S. at 49; Booker, 543 U.S. at 245–60.

After consulting the Guidelines, the Court must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553(a). *See* Gall, 552 U.S. at 50. In doing so, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. *See* 18 U.S.C. § 3553(a). The Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant; must impose a sentence that sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just punishment, and the sentence should adequately deter criminal conduct, protect the public, and provide any necessary education, training or treatment. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(D). The Court must also strive to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). After determining the appropriate sentence, the Court should adequately explain its rationale to "allow for meaningful appellate review and to promote the perception of fair sentencing." *See* Gall, 552 U.S. at 50. [2]

"Variances are 'non-Guidelines sentences that result from the sentencing judge's consideration of factors under 18 U.S.C. § 3553(a),' while departures are a term of art referring to non-Guidelines sentences authorized and 'imposed under the framework set out in the Guidelines.'" *See* United States v. Tirado-Nieves, 982 F.3d 1 (1st Cir. 2020) (quoting Irizarry, 553 U.S. at 714); United States v. Adorno-Molina, 774 F.3d 116 (1st Cir. 2014). After the

---

[2] "In reviewing a sentence for reasonableness, the Court of Appeals first examine whether, in arriving at sentence, the district court committed any procedural errors, such as failing to calculate, or improperly calculating, the advisory Guidelines range, treating the Guidelines as mandatory, failing to consider the statutory sentencing factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including any deviation from the Guidelines range" *See* United States v. Contreras-Delgado, 913 F.3d 232 (1st Cir. 2019).

guideline range is determined, the court may "depart" from the guideline range where "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." *See* Pepper v. United States, 562 U.S. 476, 494 (2011). "If the court departs from the applicable guideline range, it shall state, its specific reasons for departure in open court at the time of sentencing and…shall state those reasons with specificity in the statement of reasons form." *See* 18 U.S.C. § 3553(c).

## IV. Sentencing Guidelines Calculations

The Government agrees with the following elements of the guideline analysis as determined by U.S. Probation in the PSR.[3] The defendant's base offense level is 20 (§2K2.1(a)(4)(A)); the defendant's offense level is increased by 2 here because the offense involved at least 3 firearms but not more than 7 firearms (§2K2.1(b)(1)(A)); and the defendant's offense level is decreased by 3 levels because the defendant has accepted responsibility for his crimes.

However, the government and U.S. Probation diverge in that both parties calculated that the Base Offense Level should be increased by **4-levels** (*as stated in the plea agreement between the parties)* because **pursuant to §2K2.1(b)(5),** the defendant engaged in the trafficking of firearms. In this case, MILLER, knew he could not and then he was certainly made aware that the CW could not lawfully possess a firearm. Nevertheless, MILLER continued to engage in the

[3] The Government notes that the final PSR – accounts for ex-post facto guideline re-analysis, which stands in contrast to the guidelines agreed to by the parties in the plea agreement - this memorandum evaluated PSR calculation and plea agreement calculation, when drafted. It now notes these significant changes dues to the ex-post facto analysis in the Final PSR in contrast is accurate but for the government's contention that there should be a 4-level increase pursuant to §2K2.1(b)(5), which would also be consistent with MILLER's co-defendant in that count of the indictment.

unlawful sale of firearms, knowing the aforementioned facts, and knowing that he did not have a valid firearm's permit or federal firearms license to sell firearms or engage in firearms transactions himself. Furthermore, U.S. Probation in calculating the guidelines for MILLER's co-defendant in this count of the indictment, ROBINSON, included this enhancement in the total offense level, when calculating his GSR. ROBINSON was sentenced already by the Court.

*See* PSR ¶¶ 25, 26, 30, 31, 36, 37, 38, 39, 40, 42, 43, and 44.

**A. Offense Level Computation**

- **Count One: Trafficking in Firearms and Conspiracy to Traffick in Firearms (based on U.S. Probation's calculations)**

**¶ 25 – Base Offense Level - §2K2.1(a)(4)(A)**

The Base Offense Level: **20**

**¶ 26 – Specific Offense Characteristics**

The Base Offense Level is increased by **2-levels** because pursuant to §2K2.1(b)(1)(A), the offense involved at least 3 firearms but more than 7. In this case, the defendant possessed at least six firearms. On October 23, 2023, he sold two handguns and two rifles to a cooperating witness.

**¶ 30 – Adjusted Offense Level**

The Adjusted Offense Level is therefore: **22**. (**The parties calculated this at 26**)

- **Count Four: Distribution of and Possession with the Intent to Distribute Cocaine**

**¶31 – Base Offense Level - §2D1.1(a)(5) and (c)(13)**

The Base Offense Level: **14**

**¶ 36 – Adjusted Offense Level**

The Adjusted Offense Level is therefore: **14**.

**¶¶ 37, 38, 39, & 40 – Multiple Count Adjustment - USSG §3D1.4(a), (b) & (c).**

The Defendant is responsible for committing two different crimes; one count is firearm related, and the other count is narcotics related. According to U.S. Probation, each count is a distinct group. One unit is assigned to the group with the highest offense level. One additional unit is assigned for each group that is equally serious or from 1 to 4 levels less serious. One-half unit is assigned to any group that is 5 to 8 levels less serious than the highest offense level. Any groups that are 9 or more levels less serious than the group with the highest offense level are disregarded.

The parties did not include this multiple count adjustment in their agreed upon analysis of the guidelines in their plea. The reason for this lack of inclusion of a multiple count increase in offense level is because the parties calculated the offense level for Count 1 to include an additional 4-level enhancement bringing the adjusted offense level to 26, with Count 4 being an adjusted offense level of 14, the groups would be more than 8 levels apart in the parties calculations and so no additional levels would be included for the multiple counts.

| **Group/Count** | **Adjusted Offense** | **Level Units** |
|---|---|---|
| • Count 1 | 22 | 1.0 |
| • Count 4 | 14 | 0.5 |

Total Number of Units: **1.5**

Combined Adjusted Offense Level: **23 (U.S. Probation Only)**

**¶¶ 42 – 44 – Total Offense Level**

With prompt acceptance of responsibility, the defendant's offense level is therefore decreased by 3 – levels, which brings the Total Offense Level is **20** as calculated by U.S. Probation. The parties agreed to a Total Offense Level of **23** in their plea agreement.

## V.     Sentencing Recommendation

18 U.S.C. § 3553(a) requires a sentencing court to consider specific enumerated factors when determining an appropriate sentence.  These factors include: 1) the nature and circumstances of the offense and the history and characteristics of the defendant and 2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide for the needs of the defendant.

The Court must impose a sentence which reflects the nature and circumstances of the defendant's offense and his history and characteristics, and is "sufficient, but not greater than necessary" to serve the purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). *United States v. Kimbrough*, 128 S.Ct. 558 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

The government is recommending a sentence – of 51 months of incarceration – it is a reasonable and just outcome in a case, especially where the Guidelines appropriately consider the nature, scope, and breadth of the defendant's criminal conduct.  The government's recommendation is the product of an enormous amount of thought and consideration, and its request of the Court – to apply this significant sentence but one that is nevertheless at the low end of the guidelines as calculated by the parties here – trusting that the government's

recommendation is made with the deliberation, and that such a request while not unusual in anyway is nevertheless a substantial request.

That said, the government submits that the defendant's criminal conduct, and the harm and the impact of his crime is adequately captured by the statutory guidelines as calculated by the parties and is appropriately commensurate with the true nature of his crimes. As such this case calls out for a significant sentence like the one be recommended by the government.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. Section 3553(a) also mandates that the sentence reflect the seriousness of the offense to, among other things, promote respect for the law, provide just punishment, adequately deter criminal conduct, and protect the public from further crimes of the defendant. Here, virtually every consideration enumerated in § 3553(a) weighs in favor of not just a guidelines sentence but even potentially a longer sentence.

## VI. Discussion of § 3553(a) Factors:

Regardless of whether the Court is inclined to accept both the parties' proffered guideline calculation or U.S. Probation's, a sentence of 51 months for the defendant is "sufficient but not greater than necessary." *See* United States v. Gall, 552 U.S. 38, 44 (2007). Such a recommendation is bolstered by the considerations laid out in § 3553(a) including the nature and circumstances of the offenses, the history and characteristics of the defendant, the seriousness of the offenses, promoting respect for the law, providing just punishment for the offenses, the need to deter the defendant and others, the need to protect the public from the defendant's crimes, and the need to avoid unwarranted sentencing disparities. *See* § 3553.

### A. The Nature and Circumstances of the Offense Warrant a Sentence Above the Guidelines

The government asserts that the unchallenged factual information contained in the PSR demonstrates that the nature of the offense and firmly supports a sentence of 51 months. The defendant in this case sought to circumvent firearm laws and regulations and along with other individuals, knowing that it was clearly illegal for him to possess them, let alone for him to be party to a sale of them to the CW who was an acknowledged felon.

The purpose of a firearm is to inflict serious bodily injury or death. The defendant knew or at the very least should have known that his conduct would ultimately risk public safety and harm others.

The notion that firearms trafficking is a victimless crime, one that merely entails the illegal sale and purchase of firearms, waters down the fact the potential impact that each illegal gun has as it finds its ways to our communities. Indeed, it is impossible to overstate the impact that illegal firearms have in the hands of those willing to use them. The defendant conspired with others to provide firearms to a prohibited person, in an effort to deceive a process, which was designed to keep deadly weapons out the hands of the very people MILLER associates with and is aiding the transfer of firearms to; dangerous individuals, people who are precluded as felons, people who might use them and use them for violence.

Additionally, illegal firearms fuel criminal activity, endangering law enforcement officers and civilians alike. The defendant's actions directly undermine public safety and the rule of law. If the defendant were to get a sentence that failed to match the significance of his crimes, it sets a dangerous precedent that such conduct carries minimal consequences.

A 51-month sentence is not only sufficient but not greater than necessary, it is justified to reinforce the seriousness of these violations. The Court must send a clear message: profiting of the sale of illegal weapons will not be tolerated.

The government would suggest that there is ample evidence that the defendant was engaged beyond the events of this case, not in a singular departure from our societal norms but that the defendant's behavior evidences a series of decisions to engage in criminal conduct that extends beyond the sale of a few illegal firearms but also to the sale of a dangerous narcotic, cocaine. These decisions were not singular lapses in judgement but rather a continuous pattern of conduct to evade the laws and regulations surrounding dangerous weapons and narcotics. Furthermore, the fact that the cooperating witness was directed by MILLER to ROBINSON - an individual who amassed arsenal of firearms and drugs in his home and was already sentenced by this court to 120 months - is indicative of someone who was in this business beyond the singular sale that is at the center of this case. Indeed, during a separate transaction, the cooperating witness purchased a firearm illegally from the other co-defendant in this case, DESIR. At the time of the sale the cooperating witness was informed by DESIR that that gun he was purchasing was previously purchased by DESIR from MILLER. *See* PSR ¶ 15.

The government would suggest that there is ample evidence that the defendant was engaged beyond the events of this case, not in a singular departure from our societal norms but in a pattern of criminal conduct that extended beyond singularly setting up the sale of a few firearms or once making an introduction to facilitate the other blight in our communities, illicit drugs. Alarmingly, the defendant exhibits a similar disregard here for human life and the safety of our communities in exchange for his own personal and financial gain regardless of whether he is working in the illegal firearms or narcotics trade.

**Specific and General Deterrence**

The Court also must consider the need for the sentence to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B). Here, the Court must be concerned with both specific and general deterrence.

First, a 51-month sentence is necessary to deter the defendant from reoffending upon his release from custody. This is not a case in which the defendant committed one bad act or where he happened to be caught crossing the line on his worst day. This case did not involve a mistake or momentary lapse in judgment. Rather, the defendant here appears to have been trafficking in cocaine and firearms over a period of time. The defendant here was able to procure either firearms or narcotics at a moment's notice by making a phone call. He clearly sold firearms directly in the past to an individual he knew was not allowed to legally possess firearms, DESIR – someone he knew was in the narcotics business. He sold weapons designed to hurt or kill others – an illegal firearm has no legitimate purpose in our community but to destroy the fabric of that other not so distant community as a consequence.

Here, the considerable sentence of 51-months sends the message to this particular defendant that he will face serious consequences if he continues to commit offenses that put the public at risk in order for him to financially benefit. A sizable period of incarceration in federal prison will likely make it clear to the defendant that such behavior will not be tolerated.

An equally important consideration here is general deterrence. Across the board, this sentence will demonstrate to similarly situated individuals that those who profit off the misery of others or financially gain from sending tools of destruction into our neighborhoods, will face a substantial period of incarceration.

The government's recommended sentence here, although not insignificant here would send the correct signal to others, imbued with the same hubris, lack of respect for others, and

self-centered tendencies that there is no avoiding the serious consequences of conduct like that perpetrated by this defendant or they too will face significant imprisonment. A sentence of 51-months would not only provide just punishment in the form of deterrence for this defendant, but it would also serve to deter others from violating the law and disillusion them from the false belief that providing illegal firearms and narcotics is in anyway a worthwhile endeavor for them; the consequences will meet their conduct.

A significant sentence is necessary to provide general deterrence to others similarly situated who might be tempted to engage in the same course of conduct. The government believes there is a legitimate concern that other similarly situation individuals may similarly operate under the same misconception and decide to carry out the same behavior. An appropriate sentence would demonstrate that these individuals shouldn't be focusing on how better to profit of deadly weapons and or dangerous narcotics but rather that doing so comes at a cost. It is important that the Court's sentence adequately reflects the severity of the behavior, in order to deter others from engaging in the same conduct.

**B. History and Characteristics**

This defendant's history and characteristics also weigh in favor of the 51-month incarcerative sentence being recommended by the parties. *See* 18 U.S.C. § 3553(a)(1). The defendant's criminal and personal history documented in the PSR is concerning both because of what it says but also rather for what is noticeably absent.

The defendant a child of separation but was raised with both parents present in his life. It appears that the defendant was supported and provided with a stable home by his mother, who worked hard as the sole provider until she unfortunately was diagnosed with cancer, which led to financial instability and the loss of the family's residence when the defendant was approximately

18 years old. The defendant never endured physical, sexual, or verbal abuse, nor any substance abuse. *See:* PSR ¶¶ 55 & 56.

Nevertheless, the defendant's behavior in this case is even more concerning because it demonstrates that despite an environment that appears to have been supportive and stable over his formative years, he has chosen to engage in this criminal behavior; the government fears that without a significant period of incarceration that this destructive conduct will not be corrected, and his actions will go without meaningful consequence. The government struggles to find a clear environmental trigger or underlying issue here to remedy by means other than incarceration.

There is an inference in the PSR that without the tragic and difficult cancer diagnosis that his mother received and then the subsequent financial hardship, which resulted in its' wake, is not responsible for the defendant's poor choices. *See:* PSR ¶¶ 55 – 57. This is not to say that the defendant didn't endure a very difficult lived experience, nor is it meant to minimize his admirable choice to serve as his mother's paid personal care assistant. However, this fact doesn't absolve the defendant nor does it undue his own choices that he has made in his life, especially now, that he is no longer a child but a 29-year-old man; he should feel accountable for his decisions.  The government would suggest, even with an eye to the obstacles that the defendant certainly faced growing up, that there is ample evidence to support that the defendant's path is not one defined by his upbringing.

The government additionally asserts that the defendant's criminal history and characteristics weigh in favor of the sentence requested by the United States. The defendant has a not insignificant prior criminal history here in Massachusetts. *See* ¶¶ 47 – 51. Beginning at age 17 with the defendant being charged with Receiving Stolen Property and moving on to Breaking

and Entering in the Night, Armed Robbery (Firearm), Larceny, Assault and Battery, Kidnapping, Intimidation, Home Invasion, and Distribution of a Class D Drug; his criminal history presents a picture consistent with the government's assertion that the events charged in this case are not an isolated incident or single misstep. *Id.* Ultimately the defendant has never served more than one year incarcerated on his prior criminal conduct. This concerning pattern of behavior demonstrates that there is a risk that the defendant will engage in similar behavior once released from incarceration. The government would suggest that the defendant has been enabled by the deference provided to him by prior courts and this lack of significant consequences has emboldened him as exhibited by his commission of this crime and what appears to be on-going criminal conduct, despite his prior court interactions. The defendant does not appear to have learned from the past nor acted with any regard for his future, and as a result he is presently a danger to the community.

**D. Need to Protect the Public**

Finally, a significant sentence is also appropriate pursuant to 18 U.S.C. § 3553(a)(2)(C) to protect the public from this defendant. The defendant's conduct should cause concern for the communities of Massachusetts. By his conduct in this case, the defendant has proven himself willing and able to engage in risky and dangerous behavior by illegally providing firearms and narcotics to those willing to use them. However, much more than that, he has certainly shown his reckless disregard for public safety in his willingness to continue into other equally destructive crimes, which damage our communities. Despite his awareness of the obvious consequence or outcome of his crime. The defendant's business is one that is equally concerning and demonstrative of his willingness to put profit before the health and wellbeing of the public and their safety. His reckless disregard, his thoughtless behavior, which endangers every person in

that community by facilitating the twin ills of illegal guns and drugs bringing them into those communities. A strong sentence is necessary to deter similar conduct, ensure accountability, and prevent the potential for future incident.

His conduct is alarming, callous, and without thought for others; he should receive a 51-month sentence to afford those in his community the knowledge that concern for their safety is an important consideration for the system of justice.

**CONCLUSION**

The defendant should be responsible for choices he has made, to do otherwise minimizes the impact that his decisions have on others and the safety of the public writ large. For all the foregoing reasons, the Government respectfully recommends that the Court impose a sentence of 51-months of imprisonment, three years of supervised release, the mandatory special assessment of 200, fines, forfeiture, and any Special Conditions the Court deems necessary. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the offenses and the goals of sentencing.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: ______________________
LUKE A. GOLDWORM
Assistant United States Attorney

19

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants .

LUKE A. GOLDWORM
Assistant United States Attorney

Date: June 2, 2025